IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOTIVA ENTERPRISES, LLC; | § | |
| TEXACO, INC.; TEXACO | § | |
| DEVELOPMENT CORPORATION, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. H-05-1473 |
| LIBERTY MUTUAL INSURANCE | § | |
| COMPANY; EMPLOYERS | § | |
| INSURANCE COMPANY OF | § | |
| WAUSAU; WAUSAU | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORDER

Pending before the Court are Defendants Liberty Mutual Insurance Company,

et al.'s Motion for Summary Judgment (Instrument No. 29) and Plaintiffs Motiva

Enterprises, LLC, et al. 's Motion for Partial Summary Judgment (Instrument No. 37).

Having considered the motion, submissions, and applicable law, the Court determines

the Defendants' motion should be denied, and the Plaintiffs' motion should be granted.

## BACKGROUND

In this insurance coverage dispute, Plaintiff Motiva Enterprises, LLC ("Motiva"),

seeks reimbursement from Defendants Liberty Mutual Insurance Company ("Liberty

Mutual"), Employers Insurance Company of Wausau ("Employers") and Wausau Insurance Company ("Wausau"), (collectively, "Liberty") for the costs of indemnifying Texaco, Inc. ("Texaco") and Texaco Development Corporation ("TDC") (collectively, "Texaco entities") in an underlying personal injury suit.[1]

Motiva, a Delaware limited liability company, is involved in various aspects of the refining and delivering of petroleum-related products.[2]  On May 20, 2000, Ronald Olson, a refinery worker, suffered serious injuries following an explosion at a Motiva power plant adjacent to a refinery in Delaware City, Delaware.[3]  Olson brought suit against Motiva, Texaco, and TDC, among others, alleging negligence.[4]  At the time of

---

[1]  Defendant Wausau issued the policies, effective from July 1, 1999 to July 1, 2000. Liberty assumed responsibility for the policies following its corporate merger with Wausau. For purposes of this litigation, the Court will refer to Liberty as the policy provider.

[2]  Formed in 1998, Motiva has four members, Shell Oil Company ("Shell"), Shell Norco Refining Company ("Shell Norco"), Texaco Refining and Marketing (East) Inc. ("TRMI (East)"), and Saudi Refining, Inc. ("Saudi Refining").

[3]  Olson was employed by Connectiv Operating Services Co., which is not a party to this litigation.

[4]  Several of the Defendants in the Olson litigation were engaged in the construction and operation of a repowering project at the power plant.  The project included the calibration of an oxygen-flow transmitter.  Olson was checking a valve involved in the project when the explosion occurred. He filed suit against the companies that manufactured, purchased or acquired the valve as well as those that assisted both with the project and the opening of the valve, including Texaco and Motiva.

the accident, Motiva was covered by two Liberty insurance policies.[5] Liberty defended and indemnified Motiva, but declined Motiva's request to also indemnify Texaco and TDC under the terms of its insurance policies.[6] Consequently, Motiva paid $500,000 on behalf of the Texaco entities to settle the litigation.

In March 2005, Motiva filed the instant action seeking a declaratory judgment that Liberty must reimburse it for its payment on behalf of the Texaco entities pursuant to the terms of the two liability policies issued.[7] Additionally, Motiva asserts that Liberty breached the parties' insurance contract by refusing to cover Motiva's indemnity obligations to the Texaco entities. Motiva effectively requests the Court to declare that the policies covered its assumptions of the Texaco entities' liability and thus required Liberty to indemnify Motiva for its expenses in settling the Olson litigation on behalf of the Texaco entities.

Subsequently, on June 12, 2006, Liberty moved for summary judgment, arguing

---

[5] At the time of the accident, Motiva had a $1 million commercial general liability policy ("CGL") and a $9 million umbrella policy with Liberty. Other than the limits of liability in these policies, the relevant coverage terms are basically the same.

[6] Motiva filed suit against Liberty after Liberty refused to defend it in the Olson litigation. On June 9, 2003, Motiva obtained a default judgment requiring Liberty to defend and indemnify it for all claims for bodily injury brought as a result of the May 2000 accident. Liberty paid $750,000 to settle the Olson litigation on Motiva's behalf.

[7] Defendants removed the suit from the 151st Judicial District Court of Harris County, Texas in April 2005 based on diversity jurisdiction.

neither of Motiva's liability assumptions were covered by the insurance policies. Stated differently, Liberty asserts that Texaco and TDC have no insurable interest in the Motiva policies that entitled them to a defense or indemnity from Liberty. Motiva responded with a cross motion for partial summary judgment, arguing that Liberty breached the insurance contracts by not reimbursing it for its costs of settlement on behalf of the Texaco entities.

<u>STANDARD OF REVIEW</u>

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view the evidence in a light most favorable to the non-movant. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). When both parties move for summary judgment, courts review each party's motion independently, viewing the evidence and inferences in the light most favorable to the non-moving party. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (citing *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994)).

Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to come "forward with 'specific facts

4

showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).  It is not the function of the court to search the record on the non-movant's behalf for evidence which may raise a fact issue.  *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992).

"A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).  The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint.  *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir. 1994).  Thus, the non-movant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.  *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).

## LAW & ANALYSIS

The parties do not dispute that Motiva was covered by both the CGL and umbrella policy or that Olson sustained his injuries during the policy period. Additionally, the parties appear to agree that Texaco and TDC are not directly covered by the policies. Rather, this dispute basically is a disagreement over whether Motiva assumed the tort liability of the Texaco entities such that those assumptions are considered insured contracts as that term is defined within the policies' coverage. In other words, if Motiva assumed the Texaco entities' tort liability in an agreement that constitutes an insured contract, then Liberty was obligated under the policies to pay the $500,000 settlement.[8]

The Court notes at the outset that the enforceability of a contractual indemnity provision should be determined as a matter of law. *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 336 F. Supp. 2d 673, 674 (S.D. Tex. 2004). Generally, policies covering insured contracts are designed to provide coverage for indemnification actions, notwithstanding the fact that the Policy may offer no coverage for breach of a contractual duty." *Gibson & Assocs. v. Home Ins. Co.*, 966 F. Supp. 468, 476 (N.D.

---

[8] Specifically, the policies provided coverage for Motiva's contractual liability "[a]ssumed in a contract that is an 'insured contract,' provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." The policy also provided that if Liberty defends an insured against a suit that also names the indemnitee, Liberty will defend that indemnitee if certain conditions have been met.

Tex. 1997) (citations omitted).  Under Motiva's policy with Liberty, an insured contract includes

> [t]hat part of any other contract or agreement pertaining to your business . . . under which you *assume the tort liability* of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Thus, Liberty "has expressly agreed to provide a limited range of contractual liability coverage" beyond just the primary insured, which in this case is Motiva.  *See Gibson*, 966 F. Supp. at 476.   However, the parties disagree about whether Motiva's agreements to assume liabilities of the Texaco entities created insured contracts so as to place Texaco and TDC into the policies' realm of coverage.  Motiva asserts that two agreements–its Limited Liability Company Agreement ("LLC Agreement") and a Technical Services Agreement–obligated it to indemnify the Texaco entities against tort claims like those claims in the Olson litigation.[9]  Accordingly, Motiva asserts that by their express terms, the assumptions render the two agreements insured contracts covered under the policies.

In contrast, Liberty argues that the indemnification clause in the LLC Agreement is not legally enforceable, meaning that it cannot be deemed an insured contract.

---

[9] The Plaintiffs apparently concede the Safety, Health and Environmental Agreement, which was executed the same day as the LLC Agreement among Motiva and its members, is not an insured contract.

7

Additionally, Liberty avers the Technical Services Agreement does not constitute an insured contract because by its terms, it is not an agreement under which Motiva assumed any other party's tort liability. Alternatively, Liberty argues that the TSA expired long before this litigation arose, and therefore, was not covered by either policy. Moreover, according to Liberty, Motiva's indemnification of the Texaco entities was based upon a separate settlement unrelated to the TSA.

A. LLC Agreement

Motiva argues that its LLC Agreement constitutes an insured contract covered by both Liberty policies. Specifically, Motiva asserts that in § 13.03 of the LLC Agreement, it expressly agreed to assume the liability of several parties, including both Texaco entities, for certain bodily injuries in its operations. Section 13.03(a) of the LLC Agreement states that Motiva shall indemnify and hold harmless each "Indemnified Person against any and all Indemnified Losses." It further provides that the indemnification covers indemnified losses "resulting from any injury to Persons or damage to property, and shall apply irrespective of whether such Indemnified Losses are *caused or alleged to be caused by a failure to act* by the Indemnified Person . . . ."[10] Thus, Motiva asserts the italicized language created an insured contract that is

---

[10] The LLC Agreement incorporates definitions of the capitalized terms, which are listed in a separate schedule that defines terms throughout the documents and agreements that created Motiva. As an aside, the definitions schedule is attached to the Master Agreement

8

legally enforceable because the company assumed the tort liability of the Texaco entities even in the event of the Texaco entities' negligence.  In response, Liberty asserts that the italicized indemnification language is not legally enforceable, thereby precluding the LLC Agreement from being an insured contract.

    1.  CHOICE OF LAW

Motiva and Liberty appear to agree that if the indemnity clause is legally enforceable, then it would fall within the policies' definition of an insured contract. Therefore, if the clause is not enforceable, it would not be an insured contract covered by the Liberty policies.  However, the parties dispute whether the Court should apply Texas or Delaware law in determining if the LLC Agreement is a legally enforceable insured contract for purposes of this action.[11]  Motiva focuses on the LLC Agreement

---

("Master Agreement"), the document by which the Motiva members initially agreed to create the company.  The definitions schedule applies to all documents and agreements surrounding Motiva's creation.  According to the definitions schedule, indemnified persons include each member, each representative and each worldwide affiliate of a member.  A worldwide affiliate, in turn, is defined as "any Person, any other Person controlling, controlled by or under common control with such Person . . . ."  Person is broadly defined to include an individual, corporation, company or organization.  Motiva avers that the Texaco entities are worldwide affiliates of its member, TRMI (East), because Texaco controls both TRMI and TDC.  TDC is a wholly-owned subsidiary of Texaco, and Texaco owns TRMI Holdings, Inc., which owns Texaco Refining and Marketing, Inc., which owns TRMI (East).

[11]  The parties do not appear to dispute the enforceability of the indemnity provision in the TSA; instead, they disagree about whether the TSA constitutes an insured contract under the policies.  Consequently, the Court's choice of law discussion only relates to the LLC Agreement.

itself while Liberty concentrates on the actual policies issued to Motiva. Motiva asserts the parties to the LLC Agreement agreed it would be construed pursuant to Delaware law, and Delaware has a substantial relationship to the agreement.[12] On the other hand, Liberty contends the Court should focus on the terms of the insurance policies, which would result in the application of Texas law.[13] Liberty takes issue with the Plaintiffs' reliance on the LLC Agreement and other Texaco-Motiva agreements in support of their argument that Delaware law applies because it avers the Court should only consider these agreements for the limited purpose of determining whether they satisfy the definition of "insured contracts" in the policies.

Indeed, the Court recognizes that the choice of law could make a difference with respect to the enforceability of the LLC Agreement's indemnification clause because, as both parties acknowledge, Texas has a stricter test for enforcing an indemnity clause covering the negligence of an indemnitee. *See Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458-59 (5th Cir. 2002); *Fina, Inc. v. Arco*, 200 F.3d 266, 269 (5th Cir. 2000). However, as discussed below, the Court concludes the LLC Agreement's indemnity clause is not enforceable under either Texas

---

[12]   According to Motiva, a substantial relationship to Delaware exists because the parties to the indemnification agreements are Delaware entities, the agreements relate to real property and activity in Delaware, and the Olson lawsuit was filed and settled there.

[13]   The policies were issued to the joint venture Connectiv-Motiva Enterprises LLC in Houston and contain numerous endorsements specific to coverage in Texas.

or Delaware law and therefore cannot constitute an insured contract; thus, the Court need not decide which forum's law to apply.  Stated another way, the Court has analyzed the clause under the laws of both states, realizing that the relevant law in Texas and Delaware with respect to indemnity provisions differs, and concludes that the outcome is the same under both.  Accordingly, the Court determines it does not need to conduct a choice-of-law analysis.  *See Am. Star Ins. Co. v. Girdley*, 19 F.3d 966, 967-68 (5th Cir. 1994); *see generally R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (determining that the court need not engage a choice-of-law analysis when there is no difference between the relevant laws of the two states).

### 2.  DELAWARE LAW

As previously stated, Motiva argues that Delaware law applies in determining the enforceability of the LLC Agreement's indemnity clause and asserts that it is a valid insured contract.  Under Delaware law, contracts to indemnify a party against the consequences of its own negligence, though disfavored, are enforceable.  *See Cumberbatch v. Bd. of Trs. of Del. Tech. and Cmty Coll.*, 382 A.2d 1383, 1385 (Del. Super. 1978); *J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 546 (Del. Super. 1977).  To be enforceable, however, the indemnity provision must demonstrate a "clear and unequivocal" intent to indemnify a party for its own negligence.  *Fina*, 200 F.3d

11

at 270 (quoting *Cumberbatch*, 382 A.2d at 1386); *see also Rock v. Delaware Elec. Coop., Inc.*, 328 A.2d 449, 453-54 (Del. Super. 1974).[14]  Delaware courts have reasoned that its  "clear and unequivocal" test helps to ensure that an indemnitor is "fully cognizant of the extraordinary risks" of such assuming the liability for another party's negligence. *Fina*, 200 F.3d at 270, 272.  "Thus, to merit enforcement under Delaware law, an indemnity provision must at a minimum demonstrate on its face 'that the subject of negligence of the indemnity was expressly considered' by the parties in drafting the agreement." *Id.* at 271 (citing *Rizzo v. John E. Healy and Sons, Inc.*, C.A. No. 85-C-MY-67, 1990 WL 18378, at *2 (Del. Super. Feb. 16, 1990)).

Generally, broad provisions that purport to indemnify an indemnitee for all claims, damages, or actions will not meet Delaware's test. *See, e.g., Fina*, 200 F.3d at 271; *Seither v. Balbec Corp.*, 90C-11-257, 1995 WL 465187, at *7 (Del. Super. 1995); *Laughlin v. Delmarva Power & Light Co.*, Civ. A. No. 89-C-AU-213, 1991 WL 269893, at *1 (Del. Super. Nov. 20, 1991); *Evans v. Manor Park Shopping Ctr.*, 1989 WL 12234, at * 2 (Del. Super. Feb. 10, 1989); *Paoli v. Dave Hall, Inc.*, 462 A.2d 1094, 1098 (Del. Super. 1983); *Rock*, 328 A.2d at 456; *see also James v. Getty Oil Co.*, 472 A.2d 33, 36 (Del. Super. 1983) (noting that courts have not permitted broad,

---

[14]  The Court notes that while a party's intent to indemnify an indemnitee for its own negligence must be clear, "it need not be expressed in so many words." *Rock*, 328 A.2d at 455.

inclusive language even though logically, it would appear to encompass an indemnitee's own negligence).  On the other hand, courts generally find indemnity clauses that cover an indemnitee's "negligence" or an indemnitee's "active or passive negligence" to be sufficiently clear because the contracting parties have specifically referred to covering negligence.  *See, e.g.*, *All-State Investigation and Sec. Agency, Inc. v. Turner Constr. Co.*, 301 A.2d 273, 275 (Del. 1972); *Laws v. Ayre Leasing, Inc.*, 92C-07-254, 1995 WL 465334, at *3 (Del. Super. July 31, 1995); *Fountain v. Colonial Chevrolet Co.*, C.A. No. 86C-JA-117, 1988 WL 40019, at *12 (Del. Super. 1988); *James*, 472 A.2d at 37; *Cumberbatch*, 382 A.2d at 1386-87; *Warburton v. Phoenix Steel, Corp.*, 321 A.2d 345, 347 (Del. Super. 1974).

In the case at bar, the Court recognizes that the LLC Agreement's language falls in somewhere in the middle of the spectrum.  Motiva asks the Court to construe the language "caused or alleged to be caused by a failure to act" as similar to referencing the Texaco entities' passive negligence and to infer that the parties intended the indemnification.  Liberty asserts that the above-quoted language references causation rather than fault and therefore is insufficient to be enforceable.  The Court determines that the provision at issue does not "specifically focus attention on the fact that by agreement [Motiva] was assuming liability for [the Texaco entities'] own negligence. *See James*, 472 A.2d at 36.  Thus, under Delaware law, the LLC Agreement language

13

is not sufficiently clear and unequivocal such that the Court can affirmatively conclude
that Motiva expressly agreed to indemnify the Texaco entities for their own negligence,
albeit active or passive. *See Fina*, 200 F.3d at 271 (finding a provision unclear where
the parties failed to specifically refer to claims arising from the indemnitee's own
negligence); *Evans*, 1989 WL 12234, at *2 (noting that indemnity provisions that have
been deemed enforceable have specifically referenced negligence); *Paoli*, 462 A.2d at
1098 (finding that "[n]ot only must there be a reference to negligence . . . but the
allusion thereto must further specify that it is the negligence of the purported protected
party which is contemplated in the indemnity agreement"). Accordingly, the Court
finds the provision unenforceable under Delaware law.

    3. TEXAS LAW

    In order for an indemnity provision to be enforceable, under Texas law, its terms
must meet the express negligence doctrine.[15] *Ethyl Corp. v. Daniel Constr. Co.*, 725
S.W.2d 705, 708 (Tex. 1987). The doctrine provides that a party seeking indemnity
from the consequences of its own negligence must express that intent in specific and

---

[15] Texas courts impose a "fair notice" requirement on contractual indemnities
purporting to indemnify a party for its own negligence. *See Dresser Indus., Inc. v. Page
Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex. 1993). In order to comply with the fair notice
standard, the provision must meet the express negligence test and be conspicuous. *Storage
& Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). The parties do not appear
to contest the conspicuousness of the LLC Agreement's indemnity provision, entitled
"LIABILITY; EXCULPATION; INDEMNIFICATION."

14

unambiguous terms within the four corners of the contract. *Id.*; *see also Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994).    Indemnity provisions that do not unequivocally state the parties' intentions in the contract will not be enforced.[16]  *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 374 (Tex.App.–Houston [14 Dist.] 2005, no pet.) (citing *Fisk*, 888 S.W.2d at 814).  "Another formulation of the rule is that the provision must 'mention' the claim to be released."  *Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 333 (Tex. App.–Houston [14 Dist.] 2006, no pet.) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)).  Thus, claims not within a release provision's subject matter usually will not be deemed to meet the express negligence doctrine.  *Id.*; *see also Lee Lewis Constr. v. Harrison*, 64 S.W.3d 1, 21 n.13 (Tex.App.–Amarillo 1999), *aff'd on other grounds*, 70 S.W.3d 778 (Tex. 2001) (observing that Texas courts appear to require that the indemnity provision contain "the word 'negligence' or some synonym thereof" to meet the express negligence rule).

Thus, provisions that "explicitly and affirmatively" state the parties' intent to have an indemnitor indemnify an indemnitee for the indemnitee's own negligence typically have been enforced.  *Quorum*, 308 F.3d at 463; *see also Dupre v. Penrod*

---

[16]  The express negligence doctrine is designed to "cut through the ambiguity" of indemnity provisions and reduce the number of suits related to interpretation of such clauses. *Ethyl Corp.*, 725 S.W.2d at 708.

*Drilling Corp.*, 993 F.2d 474, 478-79 (5th Cir. 1993) ("without regard to the cause or causes thereof or the negligence of any party or parties"); *Am. Indem. Lloyds v. Travelers Prop. & Cas. Co.*, 189 F. Supp. 2d 630, 633 (S.D. Tex. 2002) ("even though such injury . . . may be . . . attributable in part to negligence or other fault . . ."); *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990) ("regardless of whether such claims are founded in whole or in part upon alleged negligence of [indemnitee]"); *Atl. Richfield Co. v. Petroleum Pers., Inc.*, 768 S.W.2d 724, 726 (Tex. 1989) ("any negligent act or omission of [the indemnitee]"); *Tynes v. Nations Rent of Tex. L.P.*, No. 10-05-0372-CV, 2006 WL 2438683, at *2 (Tex. App.–Waco Aug. 23, 2006, no pet. h.) ("whether or not caused by the active or passive negligence or other fault").  In contrast, broad statements that purport to indemnify a party for losses or claims arising from certain types of activity do not comply with the express negligence test.  *Quorum*, 308 F.3d at 463; *see also Glendale Constr. Servs., Inc. v. Accurate Air Sys., Inc.*, 902 S.W.2d 536, 539 (Tex.App.–Houston [1 Dist.], 1995, writ denied) (finding that the phrase "regardless of whether it is caused in part by a party indemnified hereunder" did not meet the express negligence rule).

In the instant action, Motiva argues that the phrase "caused or alleged to be caused by a failure to act" is sufficiently specific and clear to show the parties' intent that Motiva indemnify the Texaco entities for their own negligence.  However, the

indemnity provision does not contain the word negligence.  Moreover,  "[s]tatements that require inference or extension to impose an indemnification obligation for the indemnitee's own negligence do not satisfy the express negligence doctrine." *Quorum*, 308 F.3d at 463; *Sydlik*, 195 S.W.3d at 333.  The Court declines to infer that the words "caused by a failure to act" equate to passive negligence such that the indemnity in this case explicitly expresses the parties' intent to indemnify the Texaco entities for their own negligence.  *See Quorum*, 308 F.3d at 463; *see generally XL Specialty Ins.*, 336 F. Supp. 2d at 675 (upholding provision that stated the indemnitor would indemnify for claims regardless of whether they "were caused in part by active or passive negligence or other fault").  Therefore, the Court concludes that the indemnity provision in the LLC Agreement does not meet the express negligence doctrine.  *See Lee Lewis Constr.*, 64 S.W.3d at 21 (1999); *see also Quorum*, 308 F.3d at 464; *Sydlik*, 195 S.W.3d at 334.  Consequently, the LLC Agreement is not an "insured contract" within the meaning of the Liberty policies' coverage.[17]

B.  Technical Services Agreement

Alternatively, Motiva seeks reimbursement from Liberty based upon another agreement, the Technical Services Agreement For Use of the Texaco Gasification

---

[17]  Because the Court has determined that the indemnity clause is unenforceable, it declines to address Liberty's argument that the Olson settlement does not constituting an indemnified loss so as to fall within the LLC Agreement.

Process, Texaco Gasification Power Systems, and the Texaco Hydrogen Generation

Process ("TSA"). The TSA is a March 1997 agreement between TDC and Star

Enterprise ("Star") wherein TDC agreed to provide technical and support services at

the Delaware City refinery where Olson was injured, which in 1997 was owned by

Star.[18]   The TSA contains its own indemnity clause, which provided that Star would

indemnify TDC for all claims and liability stemming from its furnishing of services

except to the extent that the action arose from TDC's own negligence or willful

misconduct.   Thus, Liberty avers Star–and not Motiva–was the indemnitor under the

TSA, and the TSA expressly excluded any obligation to assume the Texaco entities'

negligence.   Moreover, Liberty asserts that because the Olson suit alleged TDC was

negligent, TDC should not be reimbursed because the TSA indemnity excludes such

a payment.

However, Motiva does not assert that this provision entitles it to reimbursement

from Liberty for its payment on behalf of Texaco and TDC to settle the Olson litigation.

Instead, Motiva argues that in conjunction with Motiva's creation, the TSA was

amended to cover TDC's negligence.   Therefore, Motiva argues the amended TSA is

a proper insured contract covered by the Liberty policies, and Liberty must reimburse

---

[18]   Star was a general partnership owned by TMRI (East) and Saudi Refining.   As
previously noted, TDC is a wholly-owned subsidiary of Texaco, which through a series of
corporate relationships, owns TRMI (East).

it for the Texaco entities' portion of the Olson settlement.  The Court therefore must examine the transactions and agreements surrounding Motiva's creation to determine whether the TSA and any purported amendment constitute a valid insured contract.

When Motiva was formed, the founding entities agreed to contribute assets to it in accordance with an Asset Transfer and Liability Assumption Agreement ("Asset Transfer Agreement").[19]  The Asset Transfer Agreement provided that two groups of assets would be contributed to create Motiva: the "Star Contributed Assets" and the "Shell Contributed Assets."[20]  The items that make up each of these groups of contributed assets are, in turn,  defined in the attached definitions schedule.  "Star Contributed Assets" include "all Star Contributed Contracts and all the right, title and interest of Star in all other assets used for or necessary to the operation of the Star Refineries . . . ."  Conveniently,  "Star Contributed Contracts" also are defined.  They are:

> all Contracts in respect of (a) the Star Fixed Refining and Marketing Assets, (b) the Star Intangible Refining and Marketing Assets, (c) the Star Current Refining and Marketing Assets or (d) other assets used for or necessary to the operation of the Star Refineries and the Star Marketing

[19]  The Asset Transfer Agreement was executed among Star, Saudi Refining, TRMI (East), Shell, Shell Norco and Motiva on July 1, 1998.

[20]  Under the Asset Transfer Agreement, SRI and TRMI (East) would ensure that Star transferred to Motiva all of its rights, title and interest in the "Star Contributed Assets" while Shell and Shell Norco would ensure that all of their interests, rights and title to the "Shell Contributed Assets" were transferred to Motiva.

> System (whether owned, leased or licensed) in which Star has any right,
> title or interest, including all Significant Contracts and Significant Affiliate
> Contracts to which Star is a party and excluding all Texaco Intellectual
> Property Rights and the Star Excluded Assets.

Motiva asserts that under this definition, the TSA constitutes a contributed contract and consequently falls within the definition of an insured contract.

However, Liberty contends that the TSA involves intellectual property rights and thus is explicitly excluded from this asset transfer.[21]  The definitions schedule provides that "Texaco Intellectual Property Rights" means "(i) any and all rights transferred or licensed pursuant to the Texaco Intellectual Property Agreements and (ii) any and all similar rights of Texaco, Star or their Affiliates that are not transferred, licensed or sub-licensed pursuant to the Texaco Intellectual Property Agreements because a necessary consent of a Third Party cannot be obtained."

In response, Motiva contends that the TSA does not fall within either category of Texaco Intellectual Property Rights.  First, pursuant to the definitions schedule "Texaco Intellectual Property Agreements" refers to two other unrelated documents, the Technology Transfer Agreement and the Texaco Tradename and Trademark

---

[21]  The Court notes that the TSA is not among the items listed as Star Excluded Assets.

License Agreement.[22]   Additionally,  Motiva points out that the second provision only applies if the rights were not transferred because a required third-party consent could not be obtained.  It asks the Court to infer that the requisite consent was obtained because the parties performed under the TSA after Motiva's formation.  Finally, Motiva avers that while the TSA references an earlier license agreement, it is an agreement for services.  Based upon a reading of the TSA, Technology Transfer Agreement and Texaco Tradename and Trademark License Agreement, the Court agrees that the TSA does not constitute an intellectual property agreement so as to exclude it from the assets transferred from Star to Motiva.

Also on July 1, 1998 and in conjunction with Motiva's formation, Texaco, Star and Motiva executed a separate agreement entitled the Star Contributed Asset Master Assignment and Assumption of Contracts ("Master Assignment and Assumption") that transferred Star Contributed Assets to Motiva in exchange for Motiva's assumption of all Star contributed contractual obligations.  Moreover, Texaco, Star and Motiva agreed to amend the terms of each contributed contract in which Texaco or any of its worldwide affiliates was a party ("Texaco Affiliate Contracts").[23]   The Master

---

[22]  Motiva argues, and the Court agrees, that both agreements concern the transfer of intellectual property, not services.  Furthermore, the Technology Transfer Agreement specifically excludes intellectual property relating to the parties' gasification processes, which is what the TSA involves.

[23]  Thus, a Texaco Affiliate Contract would include the TSA.

21

Assignment and Assumption provides that with respect to any Texaco Affiliate

Contract pursuant to which services would be provided by Motiva

     I.     Motiva] releases and agrees to defend, indemnify, and hold harmless the other party to such Texaco Affiliate Service Contract . . . its Worldwide Affiliates . . . from and against all losses caused by, arising out of, or in any way incidental to or in connection with the performance of services provided under such Texaco Affiliate Service Contracts, whether rising before or after the completion thereof, and in any manner directly or indirectly caused, occasioned or contributed to, in whole or in part, by the following:

        . . .

     B.     The sole negligence or fault, whether active or passive, of any of the Indemnified Parties, their respective contractors, subcontractors and/or vendors . . .;

     C.     The concurrent negligence or fault, whether active or passive, of any combination of Indemnified Parties, the Company, its contractors, subcontractors and/or vendors, or any third party . . .

        . . .

(II)   [Motiva] and the Service Provider agree and acknowledge that it is the intention of the parties that the exculpation, defense and indemnity obligations [under this agreement] are without regard to whether the negligence, fault or strict liability of an Indemnified Party is a contributory factor, and such obligations are intended to protect and indemnify the Indemnified Parties from and against any and all liability arising from the performance of this Agreement or the relevant Texaco Affiliate Service Contract, including liability based on or resulting from the sole or concurrent negligence, fault or strict liability of the Indemnified Parties.

It is undisputed that the Olson litigation arose from the Texaco entities' work at

the refinery, which was transferred from Star to Motiva.[24]  Thus, by the express terms

of the Master Assignment and Assumption, Motiva agreed to assume the tort liability

of the Texaco entities performing work at the Delaware City refinery, which renders

the TSA an insured contract under the Liberty policies at issue in this suit.[25]  *See*

*generally Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 492-93 (5th Cir.

2000) (construing the term "insured contract" broadly when an insurance company

challenged a policy holder's demand for coverage).

Liberty asserts that under the Master Assignment and Assumption's terms, the

TSA expired before Olson sustained his injuries.  Thus, Liberty avers, the TSA could

not constitute an insured contract.  The Court finds this argument unpersuasive.  Based

---

[24] Based on the evidence before it, the Court agrees with Motiva's assertion that TDC and Texaco are worldwide affiliates of TRMI (East).  Also, the Court notes Olson sustained his injuries after the TSA was amended as required by the Liberty policies.

[25] In ruling on the parties' motions, the Court reviewed the First Amendment to Technical Services Agreement For Use of the Texaco Gasification Process, Texaco Gasification Powers Systems, and the Texaco Hydrogen Generation Process ("First Amendment"), a December 31, 2002 document between TDC and Motiva submitted by Liberty to supplement its summary judgment record.  Liberty asserts the First Amendment's title definitively proves that the Master Assignment and Assumption should not be considered an amendment to the TSA.  The First Amendment, which does not reference the Master Assignment and Assumption, changes the indemnification provision.  It provides that TDC will not be indemnified if any liability or loss is attributable to its own gross negligence or willful misconduct.  Motiva responds that this amendment is merely mistitled, and even if the amendment overlaps portions of the Master Assignment and Assumption, the 2002 amendment has no bearing on the status of the relevant parties at the time Olson was injured.  The Court agrees with Motiva that the 2002 amendment is irrelevant to Motiva's indemnification provisions in effect at the time of Olson's injuries.

upon the evidence before it, Motiva and TDC continued to perform under the agreement's terms even though it had expired, thereby creating an implied-in-fact contract. *See Capital Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002) (noting that implied contracts are inferred through conduct rather than words, and continued performance demonstrates the parties' intent and mutual assent to an implied-in-fact contract).[26] Accordingly, the Court determines that the TSA, as amended by the Master Assignment and Assumption, constitutes an insured contract that falls within the terms of Liberty's insurance policies. Thus, by declining to indemnify Motiva for its settlement expenses on behalf of the Texaco entities, Liberty breached the insurance contracts it had with Motiva.[27] *See Gibson*, 966 F. Supp. at 476-77.

Finally, Liberty argues that it did not receive proper notice that Motiva was relying upon the Master Assignment and Assumption as an amendment to the TSA, which prejudices its position in this case, and that Motiva actually indemnified Texaco under a 2004 settlement and release rather than the TSA. The Court determines that based upon a review of the correspondence between the parties, Liberty had adequate

---

[26] The TSA and the Master Assignment and Assumption both provide that Delaware law applies to their terms and the parties' obligations therein.

[27] The Court finds that the current record fails to demonstrate that Liberty received a full and fair adjudication on these issues in the state court default judgment proceeding. *See Pancake v. Reliance Ins. Co.*, 106 F.3d 1242, 1244-45 (5th Cir. 1997).

notice of the basis of Motiva's breach of contract claim and the documents upon which it relies to support its position that the Texaco entities were covered under the policies' insured contract provision.  Second, the Court concludes that the 2004 settlement is irrelevant to this action, as Motiva has demonstrated that its indemnity obligation arises from the TSA as amended by the Master Assignment and Assumption that was in effect at the time of Olson's injuries.

Based upon its conclusion that the amended TSA constituted an insured contract, the Court determines there is no genuine issue of material fact with respect to Liberty's breach of the insurance contract.  Thus, partial summary judgment is granted in favor of Motiva with respect to its breach of contract claim based on Liberty's failure to reimburse it for the settlement paid on behalf of the Texaco entities.  Consequently, Liberty's motion for summary judgment on the breach of contract claims is denied. The Court reserves for trial the issue of damages related to Liberty's breach.  Accordingly, the Court hereby

ORDERS that Defendants Liberty Mutual Insurance Company, et al.'s Motion for Summary Judgment (Instrument No. 29) is DENIED.  The Court further

ORDERS that Plaintiffs Motiva Enterprises, LLC, et al. 's Motion for Partial Summary Judgment (Instrument No. 37) is GRANTED with respect to its breach of contract claim relative to the Technical Service Agreement's status as an insured

25

contract.  The Court hereby reserves for trial the issue of damages on Motiva's breach

of contract claim.

SIGNED at Houston, Texas, on this 6th day of November, 2006.


_____

DAVID HITTNER

United States District Judge

26